667 A.2d 1143

**COMMONWEALTH of Pennsylvania, Appellee,**

v.

**Timothy P. McENANY, Appellant.**

Superior Court of Pennsylvania.

Argued Sept. 18, 1995.

Filed Nov. 8, 1995.

610

Barbara A. Zemlock, Harrisburg, for appellant.

Richard E. Guida, Assistant District Attorney, Harrisburg, for Commonwealth, appellee.

Before POPOVICH, SAYLOR and BROSKY, JJ.

POPOVICH, Judge:

This is an appeal from the judgment of sentence entered in the Court of Common Pleas of Dauphin County on November 10, 1994, following appellant's conviction on charges of second-degree murder, burglary, robbery and criminal conspiracy. Appellant was sentenced to life imprisonment for the murder and consecutive one to two year sentences for both the burglary and criminal conspiracy charges. Appellant herein raises the following issues:

1. Did the trial court err in denying appellant's motion to suppress the seizure of appellant's cellular phone because the search warrant for the vehicle was deficient in probable cause and particularity?

2. Did the trial court err in denying appellant's motion to suppress cellular telephone records obtained through the improper use of a subpoena?

3. Did the trial court err in denying appellant's motion to suppress evidence obtained through a warrantless search of the memory chip within a validly seized cellular phone?

4. Was the evidence presented at trial sufficient to sustain appellant's conviction of second-degree murder, burglary, robbery and criminal conspiracy?

5. Did the trial court err in denying appellant's motion to suppress certain statements as constituting an impermissible comment on appellant's right to remain silent? [1]

Upon review, we find that the lower court properly decided the various suppression issues raised by appellant, and we agree with the lower court that the evidence was sufficient to sustain the verdict. However, we are convinced that the court erred when it permitted the Commonwealth to introduce evidence which amounted to an impermissible comment upon appellant's constitutional right to remain silent. Accordingly, we reverse and remand for a new trial.

We turn now to the issues presented. When reviewing the denial of a motion to suppress, this court must:

determine whether the factual findings of the [suppression] court are supported by the record. In making this determination, we consider only the evidence of the prosecution's witnesses and so much of the evidence for the defense, as, fairly read in the context of the record as a whole, remains uncontradicted. If, when so viewed, the evidence supports

---

1. Appellant also raised the following issues which need not be addressed because we have remanded this case for a new trial:

 1. Did the trial court err by refusing to charge the jury that the prior inconsistent statements of witnesses could be considered as substantive evidence and used for impeachment purposes.

 2. Did the trial court err by failing to instruct the jury that the Commonwealth had the burden to disprove appellant's alibi beyond a reasonable doubt.

 3. Was the verdict against the weight of the evidence.

 4. Did the trial court abuse its discretion by imposing consecutive sentences for the charges of burglary and conspiracy to the life sentence of second degree murder.

the factual findings, we are bound by such findings and may only reverse if the legal conclusions drawn therefrom are in error. *Commonwealth v. Trenge,* 305 Pa.Super. 386, 451 A.2d 701 (1982).

*Commonwealth v. Ariondo,* 397 Pa.Super. 364, 580 A.2d 341, 342–343 (1990), quoting *Commonwealth v. Schneider,* 386 Pa.Super. 202, 206, 562 A.2d 868, 870 (1989).

The facts of this case are as follows: On March 4, 1993, at 12:45 a.m., eighty-two year old Kathryn Bishop was found dead on the floor of her residence. Wayne K. Ross, a forensic pathologist, determined that Mrs. Bishop had been stomped to death sometime between 9:00 p.m. and 11:30 p.m. on March 3, 1993. Paint chips were found on Mrs. Bishop's hands, and black t-shirt fibers were on her face, neck and clothing. Additionally, Mrs. Bishop's kitchen door window had been smashed, her basement window had been opened and scuff marks were left on her clothes dryer which was located just below the basement window.

Subsequent investigation revealed that the appellant, Timothy McEnany, and his cousin, Andrew Reischman, were at Mrs. Bishop's residence to clean her chimney between the hours of 2:00 p.m. and 5:00 p.m. on March 3, 1993. While appellant and Reischman were cleaning the chimney, Mrs. Bishop and her daughter, Janet Seitz, were discussing Mrs. Bishop's finances. At this time, one of the workers was in the house. There was a large roll of paper money and a basket full of change owned by Mrs. Bishop in plain view. Mrs. Seitz and her husband left Mrs. Bishop at approximately 5:00 p.m. At that time, appellant and Reischman were still present at the house.

During the time period between March 4, 1993 and March 7, 1993, Trooper Jeffrey Stansfield spoke with appellant regarding his contact with Mrs. Bishop on March 3, 1993. Appellant told Trooper Stansfield that he had been to Mrs. Bishop's residence on March 3, 1993 to clean her chimney. Appellant also stated that he was at a bar called Shane's Flight Deck between the hours of 6:30 p.m. and 1:30 a.m. on the evening of

the murder. The bar is located about fifteen (15) miles from Mrs. Bishop's residence and over sixty (60) miles from appellant's home. A cook from Shane's saw appellant at the bar around 6:00 p.m. that evening, but not after that time. A bartender from Shane's testified that she saw appellant after midnight that evening and that he was acting in a manner to ensure that his presence was noticed.

Officers then spoke with Mrs. Bishop's neighbor, Dawn Rogers, who stated that she heard the sound of breaking glass between the hours of 10:00 and 10:30 p.m. on March 3, 1993. A couple of minutes later, Mrs. Rogers saw a person running down the street from the direction of Mrs. Bishop's house, carrying a clear bag containing a large envelope. Mrs. Rogers' description of this person matched the general description of Reischman.

On March 7, 1993, at approximately 10:25 a.m., Corporal Lester Freehling and Trooper Stansfield arrived at appellant's house and asked him if he would accompany them to the police station. At that time, Corporal Freehling told appellant that he was not required to go, that he was not under arrest and that the officers would bring him home at any time. Appellant agreed to go with the officers. The officers and appellant arrived at the police station at approximately 11:15 a.m. Then, Corporal Freehling, as a precaution, gave appellant a *Miranda* form and, once again, told him that he could stop the questioning at any time. Appellant said that he understood his rights and signed the waiver form. Corporal Freehling interviewed Appellant until 1:00 p.m. regarding events surrounding and leading up to the evening of March 3, 1993. At no time was appellant handcuffed or otherwise physically restrained.

At 1:00 p.m., Trooper McElheny met with appellant and requested that he take a polygraph examination. Appellant agreed, and Trooper McElheny then explained the examination to him for about an hour. Prior to administering the exam, Trooper McElheny obtained appellant's written consent as well as his signature on another *Miranda* form. The exam lasted from about 2:00 to 5:00 p.m., at which time Trooper

McElheny informed appellant that the results of the test indicated that he was not telling the truth. Appellant was not arrested at this time nor was he told that he could not leave.

At 5:10 p.m., Corporal Freehling rejoined the questioning, and, at 5:30 p.m., he proposed the possible scenario to appellant which follows: While appellant and Reischman were working at Mrs. Bishop's house, Reischman had seen a lot of money on the dining room table. Appellant and Reischman had gone to Shane's bar and started drinking. Reischman told appellant about the money and suggested that they rob Mrs. Bishop. The two went back to Mrs. Bishop's house where Reischman was dropped off, and appellant waited nearby in the van. Reischman returned with the money and did not tell appellant that he had killed Mrs. Bishop. Appellant first learned of her death when the two troopers arrived at his house. Corporal Freehling then said, "This may not be actually how it happened, but it is pretty close to the truth, isn't it?" Appellant's immediate response was, "Yeah, I want to tell you what happened." Corporal Freehling stopped the questioning and left the room. At this time, appellant blurted out to Trooper McElheny, "It's that fucking beer. Every time I drink I get in trouble. I really fucked up this time." Thereafter, Corporal Freehling returned and began to advise appellant of his constitutional rights. Before he could finish, appellant interrupted him and said that he wanted to do the right thing and that he knew what the right thing was. Appellant further stated that he wanted to tell what happened, but he didn't want to do anything "stupid" and wanted an attorney present before he made a statement. All questioning of appellant then ceased.

As the investigation continued, Trooper Stansfield obtained search warrants for appellant's van and residence. From appellant's residence, officers seized the clothes worn by appellant on March 3, 1993. Investigation of appellant's clothing revealed paint chips in the pocket of appellant's jacket. Paint analysis expert, John Evans, testified at trial that the paint chips found in appellant's jacket pocket were consistent with chips found on Mrs. Bishop's hands. The chips found in

appellant's jacket and on Mrs. Bishop's hands were also consistent with the peeling paint around the broken basement window. Chemist, Lee Ann Grayson, testified that fibers found on Mrs. Bishop's body matched those of the t-shirt appellant wore on the day of the murder.

Pursuant to the search warrant for the van, officers seized appellant's cellular phone. Investigation of the memory of appellant's phone revealed that the last number dialed was Mrs. Bishop's home telephone number. A subsequent search of appellant's phone records revealed two unanswered calls made to Mrs. Bishop's residence at approximately 10:07 p.m. on the night she was murdered.

■ Appellant's first assertion of error is that the search warrant for his van was issued without probable cause. When reviewing whether a search warrant was supported by probable cause, we employ the "totality of the circumstances" analysis of *Illinois v. Gates,* 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983); *Commonwealth v. Camperson,* 437 Pa.Super. 355, 650 A.2d 65, 69–70 (1994). The "totality of the circumstances" test has been summarized as follows:

> The task of the issuing magistrate is simply to make a practical, common sense decision whether, given all the circumstances set forth in the affidavit before him, including the "veracity" and "basis of knowledge" of persons supplying hearsay information, that there is a fair probability that contraband or evidence of a crime will be found in a particular place.

*Commonwealth v. Gray,* 509 Pa. 476, 503 A.2d 921, 925 (1985), quoting *Gates,* 462 U.S. at 238–239, 103 S.Ct. at 2332–2333.

The record reveals that on March 8, 1993, Trooper Stansfield applied for a warrant to search appellant's 1977 Ford Van. The affidavit of probable cause for the search warrant explained that appellant and his cousin were at Mrs. Bishop's house on March 3, 1993, between the hours of 3:00 and 5:00 p.m. At 5:00 p.m., Mrs. Bishop's daughter left her mother alone in the house with appellant and his cousin. During the time appellant was at Mrs. Bishop's house, his 1977 Ford Van

was parked outside. The affidavit further sets forth that Appellant and his cousin were the last known people to see Mrs. Bishop alive and that the time of death was sometime between 9:00 p.m. and 11:30 p.m. on March 3, 1993. The affidavit also set forth the scenario which Corporal Freehling presented to appellant describing appellant's use of the van to commit the crime, and it noted appellant's affirmation of that scenario.

Applying the "totality of the circumstances" test, we find that the issuing authority had sufficient information upon which to determine that probable cause existed. The vehicle was at the scene of the crime. Appellant was one of the last two people to see the victim alive, and appellant agreed to a scenario stating the van was used to commit the crime.[2]

 As an extension of his attack on the warrant for the van, appellant contends that the search warrant for the van lacked the specificity necessary to justify seizure of appellant's cellular phone. The search warrant for the van cites its purpose as "searching and seizing any trace evidence including, but not limited to: blood, hairs, fibers, glass, paint, and any other contraband or evidence related to this crime." The cellular phone does not fall expressly within the above listed items. Nevertheless, we find that appellant's cellular phone was validly seized under the plain view exception.[3]

2. Appellant summarily contests the probable cause set forth in the search warrants for appellant's residence and for appellant's cellular telephone records also. These two affidavits cite the same information that is within the affidavit for the van. In addition thereto, the affidavit for the residence describes clothing worn by appellant on March 3, 1993 as seen by Mrs. Bishop's daughter. The affidavit for the phone records additionally states that a phone was found within appellant's van with Mrs. Bishop's home phone number being the last number dialed. After reviewing both of these warrants using the same analysis as for the warrant for the van, we find that sufficient information existed for the issuing authority to determine the existence of probable cause.

3. We note, the use of the phrase "any other contraband or evidence related to this crime" turns a search warrant into a general investigatory tool in violation of the Fourth Amendment to the United States Constitution and Article 1 § 8 of the Pennsylvania Constitution. *Commonwealth v. Bagley*, 408 Pa.Super. 188, 197, 596 A.2d 811, 815 (1991).

Pennsylvania courts have determined that the plain view exception applies when the following three conditions are satisfied: (1) the initial intrusion must be lawful; (2) the item must have been inadvertently observed; and (3) there must be probable cause to link the observed property with criminal activity. *Commonwealth v. Daniels*, 406 Pa.Super. 112, 116, 593 A.2d 895, 897 (1991).

■ Applying the plain view exception to the present case, we find all three requirements were met. The initial intrusion by officers into appellant's Ford Van was pursuant to a valid search warrant as stated above. The officers inadvertently observed the cellular phone while searching for trace evidence. Whether probable cause existed to link the cellular phone to criminal activity requires closer inspection. When determining whether police officers had probable cause to believe that certain items were evidence of criminal activity, the probable cause standard

> merely requires that the facts available to the officer would 'warrant a man of reasonable caution in the belief,' that certain items may be contraband or stolen property or *useful as evidence of a crime;* it does not demand any showing that such a belief be correct or more likely true than false. A 'practical, non-technical probability that incriminating evidence is involved is all that is required.'

*Commonwealth v. Daniels*, 406 Pa.Super. 112, 593 A.2d 895, 898–899 (1991) (citing [*Commonwealth v.* ] *Kendrick, supra,* 340 Pa.Super. [563] at 571, 490 A.2d [923] at 927 [1985] ) (quoting *Texas v. Brown*, 460 U.S. 730, 741–43, 103 S.Ct. 1535, 1543, 75 L.Ed.2d 502, 513–14 (1983)).

As noted above, officers knew that appellant's van was used to transport appellant and his cousin to and from the victim's house on the day she was killed. More importantly, however, is the fact that appellant's cousin informed police officers that he and appellant made a phone call to the victim's residence on the day of the murder. With this information in mind, we find that sufficient probable cause existed to believe the cellular phone would be "useful as evidence of a crime" as

required by the applicable standard. Therefore, we conclude that the cellular phone was properly seized pursuant to the plain view exception.

■ Appellant asserts in his second issue for review that an improper subpoena was used to obtain his cellular phone records for March 3, 1993, thus warranting suppression of such evidence. A subpoena was issued on May 12, 1993, requesting the telephone company to produce the phone records of appellant's cellular phone. Subsequently, a valid search warrant was issued requesting the same phone records. Appellant's phone records showed two unanswered calls made to Mrs. Bishop's residence at approximately 10:07 p.m. on March 3, 1993.

■ At the time the subpoena was issued, appellant had only been arrested and preliminarily arraigned. No trial date had been set, and the criminal information was not filed until more than two weeks after the subpoena was issued. Appellant correctly observes that a "prerequisite to the issuance of a subpoena [is] that there be some pre-existing matter or cause pending before the court." *Commonwealth v. Haynos*, 363 Pa.Super. 1, 525 A.2d 394, 395–96 (1987) (quoting *Commonwealth v. Polak*, 438 Pa. 67, 263 A.2d 354 (1970)). Additionally, subpoenas are not to be used to compel production of documents merely for inspection or for a "fishing expedition". *Cohen v. Pelagatti*, 342 Pa.Super. 626, 632, 493 A.2d 767, 770 (1985). In the present case, it is clear that there was no formal proceeding before the court.

■ Although the use of the subpoena to obtain appellant's phone records was unlawful, it is not necessarily true that all subsequently obtained evidence is subject to suppression. In *Commonwealth v. Shaw*, 476 Pa. 543, 555, 383 A.2d 496, 502 (1978), the Pennsylvania Supreme Court said, "[i]n deciding whether a warrant issued in part upon information obtained through exploitation of illegal police conduct is valid, we must consider whether, absent the information obtained through the illegal activity, probable cause existed to issue the warrant." *Commonwealth v. Riffert*, 379 Pa.Super. 1, 549 A.2d 566, 573

(1988) (quoting *Shaw*). Furthermore, evidence seized pursuant to a legal warrant, independent of the initial illegal conduct, is not subject to suppression. *Commonwealth v. Camperson*, 437 Pa.Super. 355, 650 A.2d 65, 70 (1994).

The affidavit of probable cause for the search of appellant's cellular phone records was not based on any information obtained through the subpoena. And, as previously discussed, there was sufficient probability that appellant's phone records would reveal information useful to solving this crime. Therefore, we find that, although the subpoena was issued improperly, the cellular phone records were obtained lawfully pursuant to an independent search warrant.

■ Appellant's third issue proposes the question of whether an additional warrant is necessary to search the memory chip of a validly seized cellular telephone. It has been held that a warrant authorizing the seizure of a personal computer authorizes reproduction of the documents stored within. *Commonwealth v. Copenhefer*, 526 Pa. 555, 587 A.2d 1353, 1356 (1991). *Copenhefer* goes on to comment that the Commonwealth should not be prohibited from utilizing technological advances in analysis techniques on validly seized physical evidence. *Id.* The memory chip in a cellular phone is analogous to the memory of a personal computer in that both simply store information for later use. Accordingly, we find that an additional warrant was not necessary prior to inspection of the memory chip of appellant's cellular phone.

■ We turn now to appellant's fourth issue for review that the evidence presented was insufficient to sustain his conviction for the offenses charged. Appellant contests specifically that the evidence was insufficient to place appellant at the victim's residence at the time of the homicide. The applicable standard of review is "whether, viewing the evidence admitted at trial in the light most favorable to the Commonwealth and drawing all reasonable inferences in the Commonwealth's favor, there is sufficient evidence to enable the trier of fact to find every element of the [crime] charged beyond a reasonable doubt." *Commonwealth v. Carter*, 329

Pa.Super. 490, 478 A.2d 1286, 1288 (1984); *Commonwealth v. Peduzzi,* 338 Pa.Super. 551, 488 A.2d 29, 31–32 (1985).

Applying the aforementioned standard, we find that the record reveals the following: Appellant and his cousin were at the victim's residence on the afternoon of the murder, March 3, 1993, at which time they observed a large sum of money. Appellant and his cousin were left alone with the victim at 5:00 p.m. The victim's time of death was estimated between 9:00 p.m. and 11:30 p.m. on March 3, 1993. Subsequent investigations revealed that the perpetrator entered the victim's home through a basement window, took her money and killed her. Paint chips found in appellant's jacket worn on that day were consistent with paint chips found on Mrs. Bishop's hands, and both samples were consistent with the paint around the basement window. Fibers were found on the victim which were consistent with the clothing appellant was wearing on that day. Phone records revealed that two unanswered phone calls were made from appellant's cellular car phone to the victim's home at approximately 10:07 p.m. on March 3, 1993. Also, Mrs. Bishop's neighbor testified that she heard the sound of breaking glass between 10:00 p.m. and 10:30 p.m. on the night of the murder. Further, appellant was not seen at Shane's between shortly after 6:00 p.m. and 12:00 a.m. Thus, appellant offered no evidence to support his alleged alibi. Finally, appellant made statements to police officers which indicated his involvement in the charged crimes.

Upon review, we find that the evidence, when viewed in a light most favorable to the Commonwealth as the verdict winner, was sufficient to sustain appellant's convictions on charges of murder, burglary, robbery and conspiracy. Specifically, the physical evidence placed appellant proximate to the victim at the time of her death. Upon initial interrogation by police, appellant gave a statement implicating himself in the murder, albeit in a diminished role. Further, appellant knew the money to exist, and those funds were missing after the victim's murder.

■ We now turn to the merits of appellant's final issue for review. Appellant claims that admission of his statements that he "wanted to tell what happened" and "do the right thing", coupled with the testimony that he did not give a statement to the police constituted an impermissible comment on his right to remain silent. At the pre-trial conference, the trial judge ruled that the Commonwealth could enter appellant's statements that he wanted to do the right thing and that he knew what the right thing was. The Commonwealth was prohibited from introducing appellant's statement that he didn't want to do anything stupid without the presence of his attorney. *Specifically, the trial judge ordered that "[t]he jury then should not be informed beyond the fact that subsequent thereto there was no statement made."* T.T. p. 41, lines 15–20.

The record reveals the following exchange between the prosecutor and Corporal Freehling occurred at trial:

A. I again began to advise Mr. McEnany of his constitutional rights.

Q. Right to remain silent and all that?

A. Yes, sir.

Q. Did you get all the way through the rights before anything else was said?

A. No, sir.

Q. Who said something in the middle of you reading the rights?

A. A [sic] partial way through it, my reading the rights again off the form to Mr. McEnany he stated he wanted to do the right thing and he knew what the right thing was.

Q. Did you ever end up getting a statement from him?

A. No, sir, I did not.

N.T. 413, lines 4–19.

In this jurisdiction, the law regarding reference to an accused's right to silence is well settled.

The law is clear. It is reversible error to admit evidence of a defendant's silence at the time of his arrest. The prohibition of any reference to an accused's silence reflects the

court's desire that an accused not be penalized for exercising his constitutional rights. It is a recognition that most lay persons would view an assertion of the constitutional privilege as an admission of guilt.

*Commonwealth v. Hyneman,* 424 Pa.Super. 415, 419, 622 A.2d 988, 990 (1993) (quoting *Commonwealth v. Greco,* 465 Pa. 400, 350 A.2d 826, 828 (1976)).[4]

In the present case, the Commonwealth presented direct evidence of appellant's post-arrest silence. The officer testified that when he informed appellant of his right to remain silent, appellant stopped him and stated that "he wanted to do the right thing." Thereafter, in response to the Commonwealth's question, *"Did you ever end up getting a statement from him?,* the officer replied, *"No."* By offering such evidence, the Commonwealth expressly informed the jurors that appellant exercised his right to remain silent. We are convinced that this was an improper reference to appellant's exercise of his constitutional privilege from which the jury might infer an admission of guilt. *Hyneman, supra.* Consequently, appellant must be afforded a new trial which is free from the taint of impermissible comment upon his right to remain silent.[5]

Judgment of sentence reversed. Case remanded for a new trial in accordance with the provisions of this opinion. Jurisdiction relinquished.

4. Reference to an accused's silence could be harmless error if corrected by adequate cautionary instructions, especially in the case of an indirect reference by the prosecution. *Hyneman,* supra. Although this case involves a direct reference to post-arrest silence, no cautionary instruction was given.

5. Defense counsel did not object to this testimony at trial as it would have been futile. The prosecution was proceeding according to the trial judge's erroneous pretrial ruling. It is difficult to imagine a more direct comment on one's right to silence than the officer's testimony that no statement was made by appellant. Furthermore, there was no probative value to this evidence beyond the fact that appellant asserted his right to silence. There was no need for the prosecution to draw attention to the absence of a statement by appellant and it was improper for the trial judge to sanction such conduct.