2014 PA Super 189

| COMMONWEALTH OF PENNSYLVANIA, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| Appellant | |
| v. | |
| JOSHUA THOMAS WRIGHT, | |
| Appellee | No. 825 WDA 2013 |

Appeal from the Order entered April 16, 2013
In the Court of Common Pleas of Allegheny County
Criminal Division at No: CP-02-CR-0010466-2012

BEFORE:  BOWES, WECHT, AND STABILE, JJ.

DISSENTING OPINION BY BOWES, J.:                **FILED AUGUST 29, 2014**

I respectfully dissent from the learned majority's decision herein. Appellee Joshua Wright was charged with two counts of homicide, burglary and a violation of the Uniform Firearms Act.  He was accused of entering an apartment located at 552 Princeton Boulevard, Wilkinsburg, and killing Michael Lee Black and Dashawna Gibson by shooting each victim in the head while they were sleeping.  Ms. Gibson's first cousin, Brandy Clark, leased the apartment.  Ms. Gibson was temporarily staying with Ms. Clark because Ms. Gibson was afraid of Appellee, who was the father of Ms. Gibson's baby.

In the early morning hours of July 1, 2012, Ms. Clark fell asleep on the floor of the living room, which was located on the ground level of the two-story residence.  At approximately 5:30 a.m., she was awakened by someone moving past her and then she heard a gunshot emanating from the

upstairs bedroom where the two victims were located. Ms. Clark next observed Appellee "come down the steps and he stepped over" her while she pretended to be asleep. N.T. Preliminary Hearing, 8/10/12, at 14. Ms. Clark went upstairs, saw that the victims appeared to be dead, and ran back downstairs where she "looked out the front window in the living room" and saw Appellee "get into a white SUV." *Id*. at 16. Ms. Clark was afraid, telephoned her sister, and went to mother's home. She eventually contacted police.

Based upon the information supplied by Ms. Clark, police obtained an arrest warrant for Appellee. After police were informed that Appellee was at his mother's home on 3501 Chateau Lane, Murrysville, Allegheny County Police Detectives Anthony Perry and Kenneth Ruckel, who were accompanied by three Murrysville police officers, executed the arrest warrant at approximately 2:20 a.m. on July 2, 2012. Appellee's mother, Stephanie Pollard, answered the door, gave police consent to enter the home, and led them to Appellee. Appellee awoke when police arrived and was placed under arrest. Since Appellee was in his underwear, police dressed him in pants and a T-shirt and then handcuffed him.

When police were in the process of executing the arrest warrant, they observed a cellular telephone. It was located on a nightstand in the

bedroom.[1]  The battery was removed from the cell phone and was lying next to it.[2]  Police seized the cell phone and obtained a warrant to search its contents.

The warrant used to search the telephone is contained in the record. It indicates the following:

> It is your affiant's experience that cellular telephone information often provides beneficial information that assists with an investigation.  Information from the victim and perpetrator's telephone provides the following: persons with whom the perpetrator and victim recently spoke, time lines of the perpetrator and victim, contacts and identities of persons with possible information.  Information from the telephone of associates of the perpetrator and victim provides the following: persons with whom the associate spoke with before, during and after the commission of a crime and time lines of both the associate and the associate's contacts and identities of persons with possible information.  Your affiant feels this information is extremely crucial and will benefit this investigation.  It is also your affiant's experience that people who are fugitives from justice or attempting to evade detection will often turn off their cellular phones or remove their batteries in furtherance to avoid detection.

Affidavit of Probable Cause, 7/3/12, at 2 (emphasis added).

Allegheny County Detective Anthony Perry explained at the suppression hearing why he collected the cell phone at the time of Appellee's

---

[1]  While the police indicated that the cell phone was in the pocket of the shorts that they had placed on Appellee, the suppression court credited the testimony of Appellee's mother that it was located on the nightstand.

[2]  The Commonwealth's evidence that the battery was removed from the cell phone was not contradicted by the defense.  To the contrary, Appellee's mother confirmed that the battery and the cell phone "were separated. They were both laying there on the stand."  N.T. Suppression Hearing, 4/5/11, at 80.

arrest: "It's been my experience that cell phones often have crucial pieces of evidence for our case [--] to assist our case." N.T. Suppression Hearing, 4/5/13, at 11. Detective Perry delineated that cell phones contain "call logs, text messages, any contacts, photographs, videos, anything like that, of which most of those items are very fragile. They could be deleted or otherwise tampered with." *Id*. at 12. When Detective Perry seized the phone in question, he was aware that Ms. Gibson, one of the victims, had a "boyfriend/girlfriend, some type of relationship" with Appellee. *Id*. at 12. Detective Perry believed that the phone might contain evidence of contact between Appellee and the victim before the murder. *Id*. He took the device "with the intention of either myself or somebody in our office obtaining a search warrant to get the information or any potential evidence off the phone." *Id*. at 12-13.

Detective Ruckel confirmed that police were aware that Appellee and Ms. Gibson had a relationship. Ms. Clark had told them that Appellee was the father of Ms. Gibson's child and that "there were several incidents in the past where [Appellee] had been abusive and hit Dashawna Gibson and also threatened Michael Black." *Id*. at 27.

In this case, the suppression court concluded that the police improperly seized the cell phone. It noted that they did not have a search warrant authorizing the seizure of that object and rejected the

Commonwealth's position that the cell phone was discovered as part of a search incident to arrest on the basis that the cell phone was not within Appellee's reach when it was taken from the nightstand. Finally, the suppression court dismissed the Commonwealth's invocation of the plain view doctrine, which was raised in a timely motion for reconsideration. The suppression court concluded that the plain view doctrine was inapplicable since the incriminatory nature of the cell phone was not readily apparent.

On appeal, the Commonwealth claims that the plain view doctrine applied when police took the cell phone. The applicable scope and standard of review is as follows:

> When the Commonwealth appeals from a suppression order, this Court follows a clearly defined scope and standard of review. We consider only the evidence from the defendant's witnesses together with the evidence of the prosecution that, when read in the context of the entire record, remains uncontradicted. This Court must first determine whether the record supports the factual findings of the suppression court and then determine the reasonableness of the inferences and legal conclusions drawn from those findings.

*Commonwealth v. Arthur*, 62 A.3d 424, 427 (Pa.Super. 2013) (citation omitted).

As we observed in *Commonwealth v. Anderson*, 40 A.3d 1245, 1249 (Pa.Super. 2012) (citations omitted),

> the plain view doctrine provides that evidence in plain view of the police can be seized without a warrant . . . . The plain view doctrine applies if 1) police did not violate the Fourth Amendment during the course of their arrival at the location

where they viewed the item in question; 2) the item was not obscured and could be seen plainly from that location; 3) the incriminating nature of the item was readily apparent; and 4) police had the lawful right to access the item.

In this case, the police did not violate the Fourth Amendment during the course of their arrival in the bedroom where they saw the seized object since they had an arrest warrant for Appellee and were granted permission to enter the residence by its owner, who told them Appellee's location. The cell phone was not obscured as it was laying on top of the nightstand. Since police were lawfully in the bedroom, they had the legal right to obtain the item. The issue herein is whether the incriminatory nature of the object was readily apparent to police.

We have observed that when "determining whether the incriminating nature of an object is 'immediately apparent' to a police officer," we evaluate all of the circumstances attendant to the situation. ***Commonwealth v. Williams***, 73 A.3d 609, 614 (Pa.Super. 2013). The police officer's view that an object is incriminating must be supported by probable cause. ***Id***. The probable cause standard in this context "merely requires that the facts available to the officer would warrant a man of reasonable caution in the belief, that certain items may be contraband or stolen property or **useful as evidence of a crime**; it does not demand any showing that such a belief be correct or more likely true than false. A practical, non-technical probability that incriminating evidence is involved is all that is required."

- 6 -

*Commonwealth v. McEnany*, 667 A.2d 1143, 1148 (Pa.Super. 1995) (citations and quotation marks omitted; emphasis in original).

Our Supreme Court discussed the evidentiary value of cell phones in *Commonwealth v. Jones*, 988 A.2d 649 (Pa. 2010). Therein, a search warrant was issued for the murder victim's dormitory room to find, *inter alia*, any phones and pagers located therein. When executing the warrant, police saw the victim's cell phone in plain view, and they seized it. We suppressed the phone after concluding that the warrant was not supported by probable cause to believe that evidence of murder would be discovered in the victim's dormitory room since he was murdered blocks away from that location.

The High Court disagreed. It specifically held that evidence of a crime could logically be discovered in a victim's residence. In so doing, it noted that cellular telephones could contain evidence of a crime since they "could provide leads with regard to any individuals who had spoken with or contacted the victim the night of his murder." *Id*. at 656. The Court also held that the cell phone was properly seized by police under the plain view doctrine.

This Court examined whether a cell phone was incriminatory in nature and subject to seizure under the plain view doctrine in *Commonwealth v. McEnany*, *supra*. In that case, police took possession of a cell phone that was located in a van. They had obtained a warrant authorizing the search of

- 7 -

the vehicle but that document did not delineate that a cell phone was an object subject to seizure. We concluded that the cell phone was validly taken under the plain view doctrine and that its incriminatory nature was readily apparent. We observed that police had been told by one of the perpetrators that he had telephoned the victim's home prior to entering it to rob her.

Applying the logic contained in those two decisions, it is evident herein that police had probable cause to believe that the Appellee's cell phone could be useful as evidence of a crime. In a practical sense, it is probable that the cell phone would contain useful information. Even though they did not have specific information that Appellee telephoned either victim on the night of the murder, as did the police in *McEnany*, the police in this case had other facts at their disposal when they removed the cell phone from the house that gave them probable cause to believe it might be useful as evidence in this case.

Police were aware of the following when they took the phone. First, Appellee and Ms. Gibson had previously been involved in an intimate relationship that produced a child. The majority, in its analysis, overlooks that Detective Kenneth Ruckel testified that he was aware that Appellee was the father of Ms. Gibson's child. N.T. Suppression Hearing, 4/5/13, at 27. While I would agree that former lovers do not necessarily stay in touch with

each other, people with a child have frequent contact with each other regarding the well-being as well as custody arrangements for the child. They were joint parents and had that extant relationship when the murder occurred. Thus, in my view, the record supports that the cell phone would likely reveal contact between the victim and the murderer. Moreover, Appellee had been abusive toward Ms. Gibson and had threatened the other victim, which also supported the reasonable supposition that he remained in contact with the victims.

These facts all justify the belief of the police that the cell phone might contain a record of Appellee contacting the victims prior to the murder. Additionally, calls made by Appellee during the timeframe pertinent to the murder investigation could reveal his location during those calls and provide evidence that he was in the vicinity of the crime scene.

Also notable is the fact that the battery was removed from the cell phone. As the search warrant indicates, batteries are removed by perpetrators of crimes to avoid detection by police. Thus, the battery's removal from the cell phone gave police more reason to suspect that Appellee was involved in the murders and that he was using his cell phone during the relevant period that police were investigating.

The record herein also includes the search warrant and its affidavit outlining the fact that people fleeing from police will remove batteries from

their cell phones so police cannot locate them. The warrant with affidavit was admitted into evidence at the suppression hearing, N.T. Suppression, 4/5/13, at 35, and its contents were not contradicted by any defense evidence. Furthermore, the Commonwealth's evidence that the battery was removed from Appellee's cell phone was not only uncontradicted, it was confirmed by Appellee's mother.

The majority concludes that the Commonwealth waived the right to rely upon the fact that battery removal is evidence that the owner of the cell phone wanted to avoid detection by police. An appellant cannot waive facts. Issues are waived, not record evidence. The **legal issue** is whether police articulated a basis for concluding that the cell phone might have contained useful evidence. The **fact** that the cell phone was disassembled supports the legal argument that the cell phone may have contained evidence useful to this murder prosecution. In my view, on appeal, the Commonwealth is perfectly entitled to rely upon this fact of record to maintain that the incriminatory nature of the cell phone was readily apparent to the two officers in question

The holdings of ***Jones***, ***supra***, and ***McEnany***, ***supra***, simply cannot logically be distinguished herein. ***Jones*** held that a cell phone's record of telephone calls made by the victim of a murder, standing alone, renders the cell phone incriminatory in nature. Conversely, a cell phone's record of

telephone calls made by the suspected perpetrator of the crime renders that device incriminatory in nature. In this case, as in **McEnany**, there were other specific facts that were within the police's knowledge bolstering the police's belief that the phone was incriminatory in nature. Ms. Gibson and Appellee had an ongoing relationship due to their child, and Appellee was in contact with both Ms. Gibson and Mr. Black.

The evidentiary value of cell phones cannot be overstated. As Detective Perry delineated, cell phones "often have crucial pieces of evidence" that assist in solving crimes. N.T. Suppression Hearing, 4/5/13, at 11. Data in a cell phone that can aid police include "call logs, text messages, any contacts, photographs, [and] videos." **Id**. at 12. In my view, the incriminatory nature of a murder suspect's cell phone located in the room where he was arrested with its battery removed when he had been in ongoing contact with the victims is readily apparent.

As noted by the United States Supreme Court, "Cell phones . . . place vast quantities of personal information literally in the hands of individuals." **Riley v. California**, 134 S.Ct. 2473, 2485 (2014). The Court further observed that, "The term 'cell phone' is itself misleading shorthand; many of these devices are in fact minicomputers that also happen to have the capacity to be used as a telephone. They could just as easily be called cameras, video players, rolodexes, calendars, tape recorders, libraries,

diaries, albums, televisions, maps, or newspapers." *Id*. at 2489. The Court observed that even a basic, inexpensive cell phone "might hold photographs, picture messages, text messages, Internet browsing history, a calendar, a thousand-entry phone book, and so on." *Id*.; *see also id*. at 2488-89 ("Modern cell phones, as a category, implicate privacy concerns far beyond those implicated by the search of a cigarette pack, a wallet, or a purse."); *id*. at 2490 ("more than 90% of American adults who own a cell phone keep on their person a digital record of nearly every aspect of their lives—from the mundane to the intimate"). It also noted that cell phone data can reveal a person's location at any given time.

Indeed, the holding in *Riley* is premised upon the explicit acknowledgement that cell phones contain such a vast amount of personal data that the phone would **undoubtedly** contain evidence that is incriminatory in nature. *Id*. at 1292 ("In the cell phone context . . . it is reasonable to expect that incriminating information will be found on a phone regardless of when the crime occurred."); *id*. at 2493 ("Cell phones have become important tools in facilitating coordination and communication among members of criminal enterprises, and can provide valuable incriminating information about dangerous criminals."). It is precisely due to the fact that so much personal information is contained in a cell phone that police must obtain a warrant before exploring its contents. *Id*.

In this case, police obtained such a search warrant. Appellee's mother easily could have destroyed the phone if it had been left behind. As the police actions in this case were above reproach, I would reverse the suppression order herein, and therefore respectfully dissent.